IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

FANNIE MAE SELDON,                    *

    Plaintiff,                    *

vs.                                   *        CASE NO. 4:07-CV-108 (CDL)

TOTAL SYSTEM SERVICES, INC.,          *
JEFF CABLE, CASSANDRA DAY,
NERISSA MOON, and BYRON GANDY,        *

    Defendants.                   *

_____      *

O R D E R

    In shotgun fashion, Plaintiff takes aim at her former employer and various fellow employees hoping to strike one or more of them with the numerous employment discrimination claims she relies upon as ammunition. Unfortunately for Plaintiff, her inability to focus her aim is symptomatic of a complaint that contains no cognizable cause of action. Unfortunately for the Court, Plaintiff's non-targeted approach required the Court to attempt to piece together her various allegations, which has necessitated a far too lengthy order. Nevertheless, after considering all of Plaintiff's federal claims, the Court finds that Defendants are entitled to summary judgment as to each and every one. Accordingly, Defendants' Motion for Summary Judgment (Doc. 44) is granted.[1]

_____

[1]Defendants also filed a Notice of Objection, or, Alternatively, Motion to Strike (Doc. 60). The purpose of Defendants' Notice was to challenge the admissibility of various portions of Plaintiff's 32-page declaration in opposition to Defendants' motion for summary judgment. The Court has carefully considered Defendants' objections to the admissibility of Plaintiff's declaration and has not relied upon inadmissible evidence

SUMMARY JUDGMENT STANDARD

Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party has the burden of showing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). This burden can be met by showing that the non-moving party will be unable to "establish the existence of an element essential to [the non-moving party's] case, and on which [the non-moving party] will bear the burden of proof at trial." *Id.* at 322.

Once the moving party has met its burden, the burden shifts to the non-moving party to show that there *is* a genuine issue of material fact. *Id.* at 324. A fact is material if it "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). There is a genuine issue if the evidence would allow a reasonable jury to find for the non-moving party. *Id.* In other words, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

---

in rendering its ruling on the pending motion for summary judgment. The Court therefore finds Defendants' motion (Doc. 60) moot.

In determining if the parties have met their respective burdens, the Court resolves "all reasonable doubts about the facts in favor of the non-movant, and draw[s] all justifiable inferences in his . . . favor." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1983) (internal quotation marks and citation omitted). Additionally, "[i]f reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment." *Augusta Iron & Steel Works v. Employers Ins. of Wausau*, 835 F.2d 855, 856 (11th Cir. 1988) (internal quotation marks omitted).

FACTUAL BACKGROUND[2]

Plaintiff Fannie Mae Seldon asserts claims against her former employer, Total System Services, Inc. ("TSYS"), and TSYS employees Jeff Cable, Cassandra Day, Nerissa Moon, and Byron Gandy.  The Court has painstakingly reviewed each of Plaintiff's claims.  The facts relevant to those claims, when viewed in Plaintiff's favor, establish the following.

**I.   Plaintiff's Early History with TSYS**

Defendant Total System Services, Inc. is a company based in Columbus, Georgia that serves as an information technology processor of commercial transaction data.  TSYS hired Plaintiff Fannie Mae Seldon, a black female, on November 16, 1993 as a Lead Project Documentalist.  Plaintiff received favorable job evaluations in this

---

[2]Unless otherwise indicated, the following facts are undisputed and taken from Defendants' Statement of Material Facts as to Which There Is No Genuine Dispute [hereinafter Defs.' SOMF] and Plaintiff's response thereto.

capacity. (*See, e.g.,* Pl.'s Decl. ¶ 7, Jan. 26, 2009.) In 1997, Plaintiff was transferred to Database Services as a Quality Analyst II.  In 1998, TSYS changed the Quality Analyst II title to Database Administrator ("DBA") I.

Entry-level DBAs are typically classified as DBA Is, and promotion of DBAs generally follows a progression from DBA I through DBA II, Senior DBA, and Lead DBA.  Each DBA position builds on the skills the DBA learned in the position immediately preceding it. Depending on the skill set and initiative of the particular employee, a DBA may be assigned projects one or two steps above his or her current position.  In fact, TSYS generally encourages its DBAs to perform such duties to demonstrate the skills required for promotion to the next level.

Beginning in May of 2002, Plaintiff was directly supervised by Defendant Jeff Cable, a white male who held the position of Director, Applications Systems.  Cable promoted Plaintiff to DBA II on April 4, 2003.  (Cable Aff. ¶ 4, Dec. 16, 2008 [hereinafter Cable Aff. I].) In April 2004, TSYS divided the DBAs into two Information Management Systems ("IMS") teams.  Bobby Murphy, a white male, became Associate Director, Technical Support and headed one team.  Defendant Nerissa Moon, a black female, assumed the other Associate Director position and headed the second team.  Plaintiff was originally assigned to Murphy's team, and Murphy served as Plaintiff's direct supervisor from April 2004 until January of 2005.  In January of 2005, Plaintiff

4

was laterally transferred from Murphy's team to Moon's team, and Moon became Plaintiff's direct supervisor.[3]

## II.  The April 2005 Reprimand

During an April 2005 meeting involving Moon's team of DBAs, DBA Elizabeth Denise Loving openly voiced a request for assistance with a job task.  Plaintiff contends that Moon stated that a particular group of "region owners" would assist Loving with the task. Apparently believing that Plaintiff was the proper region owner to assist with the task, Loving requested assistance from Plaintiff. Plaintiff declined to assist Loving.  Plaintiff contends that she was not the proper region owner and that she told Loving that she should ask her supervisor who the proper region owner was.  (Pl.'s Decl. ¶ 74.)  Moon, like Loving, believed Plaintiff was the correct region owner to provide assistance.  Moon therefore interpreted Plaintiff's comment as an outright refusal to follow Moon's direction in a team setting.  (*See, e.g.,* Moon Dep. 165:1-2, 166: 10-19, 168:1-20; 171:1-9, Oct. 6, 2008.)

---

[3]There is a fact dispute about the reasons for Plaintiff's transfer. Plaintiff claims that she was moved to Moon's team "allegedly to bolster the knowledge base after 3 white team members bolted because of inability to work with [Moon]." (Pl.'s Resp. to Defs.' SOMF ¶ 64.) Defendants claim that the transfer came after Plaintiff sent Murphy an e-mail stating, "I'm not listening to [Murphy and another co-worker] any more.  I've made changes based on what you 2 said and now it's really screwed up.  Thanks, but I'll figure it out."  (Defs.' SOMF ¶ 59.)  Cable stated that the transfer was due to Murphy's concern about the tone and content of this e-mail and Cable's belief that Plaintiff would be more successful on Moon's team.  (Defs.' SOMF ¶ 64; *see also* Murphy Aff. ¶¶ 9, 12, Dec. 16, 2008; Moon Aff.¶ 12, Dec. 16, 2008 [hereinafter Moon Aff. I].)

Moon discussed the incident with Human Resources Manager Defendant Cassandra Day, a white female, who recommended that Moon issue Plaintiff a final written warning for insubordination.[4] Instead, Moon met with Plaintiff the next day and issued Plaintiff a first written warning for insubordination.  In the reprimand, Moon reiterated her belief that Plaintiff was the proper region owner to provide assistance, and Plaintiff was warned that her "failure to comply with [Moon's] instruction [was] insubordination and [was] not acceptable behavior."  (Defs.' Ex. 7 to Pl.'s Dep. II.)  Plaintiff was further warned that going forward, she would "be expected to accept directions from her supervisor."  (*Id.*)

**III. The September 2005 Reprimand**

On September 16, 2005, Plaintiff met with Cable to discuss some work-related issues she had been having with Moon.  At some point during this meeting, Plaintiff and Cable discussed a poor mid-year performance evaluation Plaintiff received from Moon.  Plaintiff informed Cable that she had documentation to support her claim that her mid-year performance evaluation was incorrect.  Cable informed his supervisor, Defendant Byron Gandy,[5] and Gandy notified Day of

---

[4]TSYS provides for a number of different types of formal reprimands: a documented verbal counseling, first written warning, second written warning, final written warning, and termination/dismissal.  (*See, e.g.,* Defs.' Ex. 7 to Pl.'s Dep., Sept. 17, 2008 [hereinafter Pl.'s Dep. II].) A supervisor does not necessarily have to employ the full range of reprimands before terminating an employee.  (*See, e.g.,* Day Dep. 76:7-25, Oct. 10, 2008.)

[5]Gandy's title was Director, Technical Support.  (Gandy Aff. ¶ 2, Feb. 25, 2009.)  Gandy is a white male.

Plaintiff's complaints.   Cable and Gandy met with Plaintiff on September 21, 2005 to discuss Plaintiff's concerns.   Cable informed Plaintiff that she did not need to bring anything to the meeting.

At the September 21st meeting, Plaintiff confirmed that she had documentation refuting some of the negative items in her performance evaluation.   Gandy repeatedly asked Plaintiff to provide him with documentation.   According to Defendants, "Plaintiff initially refused to provide the documentation, and then said it would take her time to locate it because she was in the process of changing offices." (Defs.' SOMF ¶ 81.)   Gandy and Cable agree that the meeting degenerated into Plaintiff's flat refusal to provide the documentation in "an unprofessional, disrespectful, and bellicose manner." (*Id.* ¶ 82.)

Plaintiff states that Gandy "demanded" that she produce the documentation refuting her performance evaluation "immediately or within 24 hours." (Pl.'s Resp. to Defs.' SOMF ¶¶ 80-81.)   She contends that she was simply unable to commit to finding the documents within twenty-four hours and that she "was not unprofessional, disrespectful, argumentative, loud-voiced, insubordinate, uncooperative, bellicose, nor refused in anyway [sic] to procure the documentation." (*Id.* ¶ 82.)   The end result of the meeting was that Gandy placed Plaintiff on administrative leave pending a review of the situation, and Cable escorted Plaintiff from the building.   Gandy notified his supervisor and Day of these events,

and termination was discussed.  However, Gandy decided to issue a final written warning to give Plaintiff another opportunity to correct her behavior.[6]

On September 22, 2005, Plaintiff was called into work and issued a final written warning for the uncooperative behavior and insubordination she exhibited during her meeting with Gandy and Cable.  The reprimand warned Plaintiff that because of "your refusal to produce the[] documents [refuting the evaluation] and your escalated/inappropriate tone during the meeting, you are being placed on final written warning for uncooperative work behavior."  (Defs.' Ex. 6 to Pl.'s Dep. II.)  The reprimand further stated that, among other things, Plaintiff was expected to cooperate with her management team, treat work conversations professionally, and conduct herself in a professional manner.  (*Id.*)

## IV.  Denial of Plaintiff's Transfer Requests

After Plaintiff received her 2005 mid-year performance review, she began applying for vacant positions outside of Moon's department. However, TSYS policy prevented Plaintiff from transferring outside the department while she had a written warning in her file.  (*See* Ex. 4 to Day Dep. at 9.)  Because of the April 20, 2005 written warning, Plaintiff would have been ineligible to transfer until October 20, 2005 without permission from Wayne Smith, a TSYS group executive.

---

[6]It is undisputed that Cable performed an investigation into Plaintiff's complaints of inaccuracies in her performance evaluation and made several changes to the evaluation as a result.

Smith gave his approval for Plaintiff to post for outside positions on September 7, 2005, but she was unable to find another position before she was issued the September 22nd final written warning. After this final written warning, Day notified TSYS's internal recruiter that Plaintiff was ineligible to transfer to a vacant position at TSYS.

## V.   Plaintiff's Requested Medical Accommodations

In January of 2006, Plaintiff's physician informed TSYS that Plaintiff had been seen in her office

> on 1/20/2006 as an unscheduled emergency visit.  Upon exam blood pressure was elevated and heart rate was accelerated. In an effort to decrease some of her problems a note was sent on 1/31/2005 regarding her health problems.  The following guidelines have been discussed again with the patient: Relief from stressful obligations, a regular work shift 8a[m]-5pm Mon-Fri and compliance with medications and appointments.  Adherence to these guidelines will assist her to good health.[7]

(Ex. 1 to Day Aff., Dec. 18, 2008 [hereinafter Day Aff. I].)  Because Day believed this note was vague, she sent a letter to Plaintiff's doctor attaching Plaintiff's job description and asking if Plaintiff could perform essential functions of her job.  Day also asked the

---

[7]Plaintiff contends that she delivered the January 2005 note to Moon, but Moon "discarded and ignored Plaintiff's doctor's foregoing request and continued to schedule her for round the clock on-call duty, Monday through Sunday, with heavy overtime workload regardless of Plaintiff's deteriorating health condition." (Pl.'s Resp. to Defs.' Mot. for Summ. J. 35.)  Moon avers that she "did not see the January 31, 2005 note from [Plaintiff's] doctor until a year after it was purportedly written," when it was attached to the 2006 doctor's note. (Moon Aff. ¶ 21, Feb. 25, 2009 [hereinafter Moon Aff. II].)

doctor to specify the nature and duration of any proposed accommodation.

In response, Plaintiff's doctor informed Day that "relieving stress will enhance [Plaintiff's] health and help keep her blood pressure at a steady near normal or normal level. Although she is certainly capable of performing her job, no one can quantitate how much stress is acceptable and when it is unacceptable." (Ex. 3 to Day Aff. I.) Plaintiff's doctor further stated that she "thought it reasonable that [Plaintiff] explain to her supervisor that stress may be contributing to these elevated readings and see if you can work with her to improve her health and help decrease the stress at work." (*Id.*) Plaintiff's doctor concluded that "[s]ince hypertension is often a life long disease, it would seem these consideration[s] would need to continue indefinitely." (*Id.*)

Defendants contend that in response to the doctor's orders, Cable and Moon immediately removed Plaintiff from the on-call rotation, effectively relieving her from overtime work.[8] (*See, e.g.,* Cable Aff. I ¶¶ 16, 18.) It is undisputed that Moon and Cable met with Plaintiff to discuss what tasks she could accomplish in a forty-hour week, and Plaintiff proposed a schedule which Moon and Cable approved. Day interpreted Plaintiff's doctor's response as requiring

---

[8]Plaintiff contends she was not removed from the on-call rotation. (Pl.'s Resp. to Defs.' SOMF ¶ 190; *see also* Pl.'s Dep. II 81:5-9 ("I was always on call. There was never a time when I was not, in 2005 and '6, when I was not on call. I was told [by Moon, Cable, and Gandy] that I'm on call 24 hours a day.").)

only that Plaintiff's work week be limited to forty hours and that it was immaterial on which days those forty hours were worked; Plaintiff was therefore scheduled to work on one Saturday, in a week where her hours would not exceed forty, to complete a scheduled outage for a client. (Defs.' SOMF ¶ 195.)  Plaintiff contends this action was the result of Day's discriminatory "refus[al] to properly read and interpret the plainly written letter from" Plaintiff's physician. (Pl.'s Resp. to Defs.' SOMF ¶ 195.)  It is undisputed that covering outages is an essential function of a DBA's job.

**VI.  Plaintiff's Termination**

The events surrounding Plaintiff's termination are hotly contested by the parties.  Defendants' first stated reason for Plaintiff's termination was insubordination.  Defendants' second stated reason for termination was uncooperative work conduct.

A.  Insubordination

Defendants submit that in March of 2006, Moon scheduled testing of new database changes with one of TSYS's internal clients.  The testing would result in a four-hour outage, during which the client's entire system would be inoperable; thus, Moon scheduled the testing to occur during two Saturdays in May, thereby minimizing interruption of the client's business.  (Defs.' SOMF ¶¶ 97, 98.)  As previously mentioned, Plaintiff was scheduled to cover at least one of these Saturday outages.

11

Defendants contend that without consulting management, Plaintiff called the internal client, failed to inform the client about the duration of the testing, and changed the testing to a weekday. (*Id.* ¶¶ 99-100.) Defendants assert that by rescheduling the outage for a weekday without informing the client of the outage's length, Plaintiff misled the client. (*Id.* ¶ 101.) Defendants contend that "Plaintiff's behavior resulted in unnecessary confusion, which her management had to correct[,]" and "[m]ore importantly, Plaintiff's actions underscored her failure to respect management and follow directions." (*Id.* ¶¶ 103, 104.) Defendants informed Plaintiff that this circumvention of her management and improper and unauthorized client contact was insubordinate. (Defs.' Ex. 5 to Pl.'s Dep. II.)

Plaintiff contends that Cable, not Moon, originally scheduled the outage for a weekday; that Moon merely proposed the four hour downtime and weekend outages to the internal client; and that Plaintiff was never informed of Moon's proposal or that the internal client had accepted Moon's suggestion to change the outages to a Saturday.[9] (Pl.'s Resp. to Defs.' SOMF ¶ 197.)   While Plaintiff

---

[9]Defendants draw the Court's attention to an e-mail from Moon to Plaintiff suggesting that Plaintiff knew the outage was scheduled for a Saturday but contacted the internal client to confirm the weekday outage regardless:

> Fannie,
>     Outage windows for [the project at issue] ha[ve] bee[n] approved on the IP platform on Saturdays.  The schedule is in the team meeting notes.
>     The implementation of compression routines will be on Saturdays from 8am to noon on May 6 . . . and May 22 . . . . Please explain your objections to working your region outages

admits that she did contact the internal client, she contends such contact was customary and that neither Moon nor Cable instructed her not to contact the internal client or schedule any outages in this particular situation.  (*Id.*)

B.   Uncooperative Work Conduct

Defendants also terminated Plaintiff for continued uncooperative work conduct.  On April 14, 2006, Clifford Johnson, a black male co-worker, asked Plaintiff to respond to a request for information. Defendants contend that Plaintiff "inappropriately challenged why Mr. Johnson needed the information, and he complained in writing to Dr. Moon." (Defs.' SOMF ¶ 106.) Johnson forwarded Moon the e-mail chain originating with his request and culminating in Plaintiff's final response, relating his frustration by noting, "Oh the joy of teamwork!!  It's like pulling teeth with rusty pliers or pulling a toenail with a pick axe to get a simple question answered[.]"  (Ex. 5 to Moon Aff. I.)   Defendants cited this exchange as "another example of [Plaintiff's] uncooperative work behavior." (Defs.' Ex. 5 to Pl.'s Dep. II.)

Plaintiff was ultimately informed that "[a]s a result of your actions on Sept. 16, 2005 you were placed on final written warning for uncooperative work behavior.  Events of the past weeks have

---

on the weekend.

(Ex. A to Moon Aff. II.)  This e-mail was sent on April 11, 2006; Plaintiff contacted the internal client on April 17, 2006.  (Ex. B to Moon Aff. II.)

demonstrated you are not following the instructions regarding cooperativeness at work." (*Id.*)  Plaintiff was terminated on April 21, 2006.

**VII. Plaintiff's Claims**

Plaintiff's Complaint alleges numerous claims under federal statutes which prohibit unlawful discrimination in the workplace: the Equal Pay Act of 1963, 29 U.S.C. § 206(d) ("EPA"); Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"); and 42 U.S.C. § 1981 ("§ 1981").  Specifically, Plaintiff brings claims for (1) § 1981 race discrimination against TSYS, Gandy, Cable, and Day; (2) Title VII race discrimination against TSYS; (3) Title VII gender discrimination and harassment against TSYS; (4) retaliation and retaliatory discharge against TSYS, Gandy, Day, Moon, and Cable under Title VII, the EPA, and § 1981; and (5) violation of the EPA.  Plaintiff also asserts state law claims for (1) negligent retention against TSYS and (2) intentional infliction of emotional distress against all Defendants.  For the following reasons, the Court finds that Defendants are entitled to summary judgment as to each of Plaintiff's federal law claims.  The Court declines to exercise subject matter jurisdiction over Plaintiff's state law claims and dismisses those claims without prejudice.

DISCUSSION

## I.   Plaintiff's EPA Claim

Plaintiff first contends that she was the victim of wage discrimination because she was paid less for performing jobs substantially equal to those of her male counterparts. (*See, e.g.,* Compl. ¶¶ 76, 85.)   She accordingly brings a claim for wage discrimination under the EPA, which prohibits employers from discriminating

> between employees on the basis of sex by paying wages to
> employees in such establishment at a rate less than the
> rate at which he pays wages to employees of the opposite
> sex in such establishment for equal work on jobs the
> performance of which requires equal skill, effort, and
> responsibility, and which are performed under similar
> working conditions[.]

29 U.S.C. § 206(d)(1).

Defendants contend that Plaintiff failed to establish a prima facie case of wage discrimination under the EPA because Plaintiff has failed to demonstrate that her comparators, each of whom holds a position one or two levels higher than Plaintiff's DBA II position, performed work substantially equal to that performed by Plaintiff. Moreover, Defendants contend that even if Plaintiff could establish a prima facie case of wage discrimination, Plaintiff has failed to show that genuine issues of material fact exist regarding the validity of Defendants' affirmative defense.   For the following reasons, the Court concludes that Defendants are entitled to summary judgment on Plaintiff's EPA claim.

15

A.   Plaintiff's Prima Facie Case and Proposed Comparators

An employee establishes a prima facie case of discrimination under the EPA by demonstrating that the employer "pays different wages to employees of opposite sexes for equal work on jobs . . . [requiring] equal skill, effort, and responsibility, and which are performed under similar working conditions." *Irby v. Bittick*, 44 F.3d 949, 954 (11th Cir. 1995) (alterations in original) (internal quotation marks omitted); *see also Steger v. Gen. Elec. Co.*, 318 F.3d 1066, 1077-78 (11th Cir. 2003).  Plaintiff has identified evidence in the record to suggest that Derek Moffett, Homayoon Mohajer, Myron Perlmutter, David Shortley, Roney Bell, Glen Ewing, Douglas Lynn Hall, Joey Phillips, Tom Rajnak, Ken Potter, and Tim Simon were paid comparably more than she was at or near the time of her termination.[10]

---

[10]Defendants contend that Plaintiff identified only Simon, Perlmutter, Ewing, and Phillips as potential comparators in her deposition. (*See* Pl.'s Dep. 102:4-103:19, Sept. 4, 2008 [hereinafter Pl.'s Dep. I].)  In her Complaint, however, Plaintiff alleges that Len Hall, Joel McAlister, Clifford Johnson, Jody Blankenship, Stephen Yoon, and Eric Wood are also appropriate comparators. (Compl. ¶¶ 75, 76.)  During the hearing on the pending motions, Plaintiff also identified Donald Stephens as a potential comparator.

The record reveals that at least two of the comparators named in Plaintiff's Complaint were paid less than Plaintiff: McAlister was promoted to DBA II on April 1, 2005 and held that position until his resignation in August of 2005, when his salary was $43,768.00. (Ex. 24 to Pl.'s SOMF.)  Likewise, in April of 2006, when Plaintiff was terminated, Wood was a male DBA I who was paid $40,903.20. (Ex. 52 to Day Dep.)  Plaintiff's salary was $47,463.00 in both 2005 and 2006. (Day Aff. I ¶ 20.)  Plaintiff also specifically abandoned her contention that Johnson is an appropriate comparator. (*See, e.g.,* Pl.'s Resp. to Defs.' Mot. for Summ. J. 14.)  Furthermore, Plaintiff failed to direct the Court to evidence that Blankenship, Yoon, and "Len Hall" were paid more than she was. (*See* Exs. 20 & 21 to Pl.'s Mot. for Summ. J.)  Accordingly, the Court will consider only Stephens, Moffett, Mohajer, Perlmutter, Shortley, Bell, Ewing, Douglas Hall, Phillips, Rajnak, Potter, and Simon as comparators.

The Court accordingly summarizes Plaintiff's comparators in the following table:

| Name | Race/Gender | Date | Title | Salary |
|------|-------------|------|-------|--------|
| **Fannie Seldon** | Black/Female | 04/21/06 | DBA II | $47,463.00 |
| **Donald Stephens**[11] | White/Male | 02/07/04 | DBA I | $52,053.00 |
| **Derek Moffett** | White/Male | 06/01/06 | Senior DBA | $79,170.00 |
| **Homayoon Mohajer** | Persian/Male | 06/01/06 | Senior DBA | $73,185.00 |
| **Myron Perlmutter** | White/Male | 04/15/06 | Senior DBA | $78,954.00 |
| **David Shortley** | White/Male | 07/02/04 | Senior DBA | $77,850.00 |
| **Roney Bell** | Black/Male | 06/01/06 | Senior DBA | $74,442.70 |
| **Glen Ewing** | White/Male | 06/01/06 | Senior DBA | $82,874.00 |
| **Douglas Hall** | White/Male | 06/01/06 | Senior DBA | $81,056.00 |
| **Joey Phillips** | White/Male | 08/01/06 | Senior DBA | $71,457.12 |
| **Tom Rajnak** | White/Male | 05/20/06 | Senior DBA | $72,821.00 |
| **Kenneth Potter** | White/Male | 06/01/06 | Lead DBA | $90,582.00 |
| **Tim Simon** | White/Male | 06/01/06 | Lead DBA | $89,037.00 |

(*See generally* Exs. 20 & 21 to Pl.'s SOMF.)  As evidenced by this chart, however, it is clear that Plaintiff has failed to identify any male *DBA II* who was paid more than Plaintiff at a comparable time.

Plaintiff contends that (1) the positions of DBA II, Senior DBA, and Lead DBA are substantially equivalent and (2) she actually performed Senior and Lead DBA duties while being compensated at the DBA II rate.  Rather than analyze the validity of these contentions,

---

[11]In 1998, Stephens's starting salary as DBA I was $45,400.00.  (Ex. 50 to Day Dep.)  Stephens left TSYS on February 7, 2004.  (*Id.*)  Shortley, a Senior DBA, left TSYS on July 2, 2004.  In June of 2004, Plaintiff's DBA II salary was $47,463.00.  (Ex. 21 to Pl.'s SOMF.)

17

the Court will assume, without deciding, that genuine issues of material fact exist regarding whether Plaintiff has established a prima facie case of wage discrimination under the EPA.   The Court therefore turns to the issue of Defendants' affirmative defense.

> B.   <u>Affirmative Defenses Under the EPA</u>

Once the plaintiff establishes a prima facie case of wage discrimination under the EPA, the defendant employer "may avoid liability by proving by a preponderance of the evidence that the pay differences are based on '(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of productions; or (iv) . . . any other factor other than sex.'" *Steger*, 318 F.3d at 1078 (alteration in original) (quoting 29 U.S.C. § 206(d)(1)).   "The employer bears the burden of proof for these affirmative defenses[,]" and that "burden is a 'heavy one.'"   *Irby*, 44 F.3d at 954 (quoting *Mulhall v. Advance Sec., Inc.*, 19 F.3d 586, 590 (11th Cir. 1994)).   The employer "must show that the factor of sex provided *no basis* for the wage differential[.]" *Irby*, 44 F.3d at 954 (internal quotation marks omitted).   In the Eleventh Circuit, "[i]f the employer establishes that the disparity is justified by one of these exceptions then the plaintiff must come forward with affirmative evidence that indicates that the proffered reason for the disparity is actually a pretext for sex discrimination." *Schwartz v. Fla. Bd. of Regents*, 954 F.2d 620, 623 (11th Cir. 1991) (per curiam); *see also Irby*, 44 F.3d at 954.   *But see Mulhall*, 19 F.3d at 590-91

18

(observing that if an employer meets its burden of establishing that no genuine issues of material fact exist regarding the validity of its affirmative defenses, it is absolved of liability as a matter of law).[12]  In short, Defendants must establish that there are no genuine issues of material fact regarding the validity of its affirmative defense to prevail upon their motion for summary judgment.  *See Mulhall*, 19 F.3d at 590-91.

C.   Factors "Other than Sex"

Defendants rely on the EPA's "catch-all" affirmative defense, arguing that any difference in compensation was "based on legitimate factors other than sex, such as job performance (including depth and breadth of job knowledge) and the complexity, difficulty, and scope of the job[.]" (Defs.' Mem. of Law in Supp. of Defs.' Mot. Summ. J. 9.)  Although Defendants do not contend that these factors are part of a formal merit pay system, when other types of "subjective business justifications . . . are not overly subjective so as to render them incapable of being rebutted, they are legitimate factors to be considered" in determining whether Defendants have met their burden of proof regarding a "factors other than sex" affirmative defense.  *Schwartz,* 954 F.2d at 623 (finding that "outstanding

---

[12]While a plaintiff may attempt to demonstrate that a genuine issue of material fact exists by producing evidence of pretext, the defendant still bears the ultimate burden of persuasion that such genuine issue does not exist.  *See, e.g., Mulhall*, 19 F.3d at 591 ("[B]y moving for summary judgment under the EPA, defendants thrust before the court . . . the strength of their own defense and must establish that there is an absence of any issue for jury resolution.").

service to the [employer], administrative duties, publications, research, supervision of doctoral students, and performance" were "sufficiently objective" to be considered in determining whether employer had proven that factors other than sex justified wage differential); *see also Irby*, 44 F.3d at 956 (noting that experience is a legitimate business reason that may be used by an employer to justify a wage differential, so long as it is not offered as "a post-event justification" for such differential).

In this case, unrebutted testimony establishes that TSYS considers job performance, job knowledge, and the complexity, difficulty, and scope of the job in setting its pay decisions. (*See, e.g.,* Day Dep. 150:17-151:11 (recruiters and hiring managers "look[] at education, experience, related work experience" in setting salaries of new hires; with at-desk promotions, e.g., from DBA I to DBA II, education and prior experience have already been evaluated); Ex. 4 to Day Dep. at 10.) Defendants have produced ample evidence demonstrating Plaintiff's lack of in-depth job knowledge. Moon avers that Plaintiff's performance was often deficient, even when Plaintiff was assigned lower-level DBA I tasks. (Moon Aff. II ¶¶ 11, 12, 16, 25, 28; *see also id.* ¶ 8 (noting that Plaintiff "struggled to perform" a task similar to those being performed by DBA Is); *id.* ¶ 13 (noting that Plaintiff worked on a project for four months without completing it; the project was reassigned to a DBA I who completed the project "from scratch" in two weeks).) In Plaintiff's

performance evaluation, Moon ranked Plaintiff's technical skills as only occasionally meeting TSYS standards for her DBA II position. (Ex. 33 to Pl.'s SOMF at S000196.)  In fact, during her employment as a DBA II, Plaintiff never received an evaluation above "average" from any of her supervisors.  (*See* Moon Aff. I ¶ 16 ("[Plaintiff's] job performance was below my expectations."); Cable Aff. I ¶ 6 ("After her promotion to DBA II, [Plaintiff's] performance in my opinion did not merit further promotions."); Murphy Aff. ¶ 6 (finding Plaintiff's "performance was average, at best.").)

Moon also stated that Plaintiff would be unable to perform many Senior or Lead DBA duties because Plaintiff did not possess

> (1) an understanding of how different components are created or how they work together; (2) an understanding of process improvement; (3) knowledge of products; (4) knowledge of implementing conversion projects or analyzing data to formulate sizing requirements; (5) an ability to analyze data growth patterns and projected volume increases to formulate outage plans that would allow the environment to be flexible and adaptive to the clients' needs; (6) an ability to organize tasks to complete an outage within the scheduled window; and (7) an ability to research IMS and application issues.

(Moon Aff. I ¶ 18.)  Further, Moon asserted that Plaintiff "lacked in-depth knowledge of disaster recovery" because she had not "(1) demonstrated the ability to process outside the context of a checklist; (2) explored, understood, or demonstrated the recovery process; (3) explored, understood, or demonstrated the vendor products' commands and the effects of the commands; or (4)

demonstrated the ability to assist in diagnosing problems and designing solutions." (*Id.*)

In addition, Defendants argue that the majority of Plaintiff's proposed comparators had significantly more related job experience than Plaintiff. *See Irby*, 44 F.3d at 956 ("Experience is an acceptable factor other than sex if not used as a pretext for differentiation because of gender."). The record amply supports Defendants' contention. At most, Plaintiff had accumulated thirteen years of TSYS experience and had not yet earned a college degree when she was terminated in 2006. (*See* Pl.'s Decl. ¶¶ 3, 11, 20.) Each of Plaintiff's proposed comparators except for Phillips has job related experience at least equivalent to that of Plaintiff. When Bell was hired as a programming project leader, he had a bachelor's degree in computer information systems and mathematics and approximately ten years' related experience. (Ex. C to Day Aff., Feb. 24, 2009 [hereinafter Day Aff. II].) He was promoted to Senior DBA in 2007, after he had accumulated thirteen years' experience, the same as Plaintiff. Simon had over fourteen years' related experience when he was hired as a Senior Programmer Analyst in 1995. Simon became a DBA II in 1998 with seventeen years' experience, and he was promoted to Senior DBA in 2001 and Lead DBA in 2003. (Exs. 1 & 2 to Simon Dep, Sept. 17, 2008.) When Ewing was hired as a Test Manager in 1996, he possessed an associate's degree in computer science, a bachelor's degree in business, and seven years' related computer

22

experience.   Ewing was promoted to DBA II in 2001, Senior DBA in 2003, and Lead DBA in 2007.  (Exs. 45-46 to Day Dep.)  Stephens was hired as an Operations Support Analyst in 1996, and he had approximately eight years' related experience when hired.  He became a DBA I in 1998, and he remained in this position until he left TSYS in 2004.  (Exs. 49-50 to Day Dep.)

Hall, Moffett, Mohajer, Potter, Rajnak, Shortley, and Perlmutter were all hired as Senior DBAs.  Hall possessed fifteen years' related experience and a degree in computer programming.  (Ex. 41 to Day Dep.)  Moffett had approximately seventeen years' related experience and a college degree.  (Ex. 35 to Day Dep.)  Mohajer had at least twenty years' related experience and a college degree.  (Ex. 53 to Day Dep.)  Potter had twenty-eight years' related experience.  (Ex. 37 to Day Dep.)  Rajnak was hired in June 2003 with over twenty years' related experience.  (Ex. E to Day Aff. II.)  Shortley had twenty-four years' related experience and a bachelor's degree in computer science.  (Ex. D to Day Aff. II.)  Perlmutter had more than twenty years' experience when hired.  (Ex. 6 to Moon Aff. I.)  It is thus clear that when each of these proposed comparators was promoted or hired past the rank of DBA II, each had more relevant experience and/or education than Plaintiff, who had, at most, thirteen years' experience and no related degree.

It appears that only one of Plaintiff's potential comparators, Phillips, had less experience in terms of length of service than

Plaintiff when he was promoted above the DBA II level.[13]  However, the record demonstrates that Phillips possessed more job knowledge than did Plaintiff.  For example, Moon declared that Phillips

> provided technological leadership for our IMS team, and created classes to share his methodology.  He performed tasks involving in-depth knowledge of IMS concepts, departmental standards and procedures, sizing concepts and computations, vendor products, recovery strategies, and problem research and resolution.  He also assigned projects and tracked their implementation.  He was a consultant in design reviews and capacity needs.  He assumed leadership roles across all IMS teams by leading the V10 conversion and by acting as technical specialist during monthly database outages.  He was multifaceted and readily accepted leadership challenges.  Mr. Phillips also demonstrated teamwork, communication, adaptability and database management expertise.

(Moon Aff. I ¶ 30; *see also* Cable Aff. I ¶ 22 ("At the time of his promotion [to Senior DBA], Mr. Phillips had demonstrated in-depth knowledge of IMS. . . . His job knowledge and performance well exceeded his job level.").)  As previously discussed, Plaintiff's supervisors believed her job skills had not reached this same level. (*See, e.g.,* Moon Aff. I ¶¶ 18, 19.)

Defendants confirmed at the hearing on the pending motions that Plaintiff's salary as a DBA II was within the salary zone specified for the position, (*see, e.g.,* Day Dep. 184:16-186:14 (salary range for DBA II in 2003 was $41,100-$62,500));[14]  that at least one white

---

[13]Phillips was hired as a DBA I in 1997.  He was promoted to DBA II in 2001, Senior DBA in 2003, and Lead DBA in 2007.  (Cable Aff.  I ¶ 22.)

[14]Salary zones are determined based on components including degree of complexity, difficulty, scope, and impact on the business.  (Day Dep. 149:9-14.)

24

male DBA II was paid less than Plaintiff, (*see* Defs.' SOMF ¶¶ 213-14); and that two female DBA IIs were paid more than Plaintiff, (*see, e.g.,* Defs.' SOMF ¶ 212 (DBA II Lamonia Whitaker was paid more than Plaintiff); Ex. 34 to Day Dep. (DBA II Melissa Smith was paid more than Plaintiff)). The record therefore reveals that gender played no part in the wage differential at issue in this case.

> D.   Evidence of Pretext

An EPA plaintiff may attempt to establish that a genuine issue of material fact exists regarding a defendant's affirmative defense by directing the court to evidence that the reasons proffered for the wage differential were merely a pretext for unlawful wage discrimination or a post-event justification for a gender-based differential.[15]  *See, e.g., Irby*, 44 F.3d at 954; *see also Schwartz*, 954 F.2d at 623.  To establish pretext, Plaintiff appears to rely primarily on her contention that she was an "exceptional" employee and that she regularly performed Lead and Senior DBA tasks.[16]  To

---

[15]Plaintiff does not attempt to argue that Defendants' proffered reasons for the wage differential constitute a post-event justification for the disparity.  Indeed, there is unrebutted testimony that TSYS recruiters and hiring managers would have "look[ed] at education, experience, [and] related work experience" in setting salaries of new hires and candidates for promotion. (Day Dep. 150:17-151:11; *see also* Ex. 4 to Day Dep. at 10.)

[16]The TSYS compensation policy identifies two "key principles" on which their compensation program is based: (1) "recognition that jobs vary in degree of complexity, difficulty, scope, and impact on business results" and (2) "[r]ecognition that individual team members achieve different levels of performance." (Ex. 4 to Day Dep. at 10.)  The compensation program explicitly states that it "measures and recognizes individual performance; not length of service." (*Id.*) Length of service, however, is distinguishable from job-related experience in comparable

establish that she was an exceptional DBA II, Plaintiff points to Moon's testimony which indicates that some "exceptional" DBA IIs "have matured to help be production region owners. And they on a regular basis have conversations with senior DBAs, leads, and the [technical analysts] to get insight on how to adjust to handling production data."[17]  (Moon Dep. 80:22-81:3.) Plaintiff contends that she must have been an "exceptional" employee because she was a region owner who performed a good deal of her work without supervision. (*See, e.g.,* Pl.'s Decl. ¶¶ 32, 41.) Plaintiff also describes various job functions that she performed that she contends were appropriately assignable to Senior and Lead DBAs.

The Court first notes that an employee's unsubstantiated belief that she was an exceptional employee is typically insufficient to create a genuine issue of material fact with regard to pretext. *Cf., e.g., Holifield v. Reno*, 115 F.3d 1555, 1565 (11th Cir. 1997) (per curiam) (holding that in a Title VII case, "[t]he inquiry into pretext centers upon the employer's beliefs, and not the employee's perceptions of his own performance" and "where the employer produces performance reviews and other documentary evidence of misconduct and insubordination that demonstrate poor performance, an employee's

---

work.  Furthermore, it is undisputed that "each DBA position builds on the job knowledge of the lower position in the progression line." (Defs.' SOMF ¶ 30.)  Thus, job-related experience is directly relevant to job knowledge in this particular case.

[17]Cable averred that "[b]eing a region owner is expected of all DBA IIs.  Some DBA Is are also region owners." (Cable Aff. ¶ 6, Feb. 25, 2009 [hereinafter Cable Aff. II].)

assertions of his own good performance are insufficient to defeat summary judgment, in the absence of other evidence"); *Mihoubi v. Caribou Coffee Co.*, 288 F. App'x 551, 555 (11th Cir. 2008) (per curiam).

Furthermore, even if Plaintiff was a region owner and performed some Senior and Lead DBA job duties, this evidence fails to directly rebut Defendants' affirmative defense. *See Steger*, 318 F.3d at 1078. Notably, Plaintiff has not directed the Court to any record evidence that refutes her supervisors' sworn affidavits which attest to the particular job skills Plaintiff lacks.  Further, Plaintiff made no effort to rebut Defendants' contention that her comparators have job-related experience and knowledge superior to her own. *See, e.g., Irby*, 44 F.3d at 956 ("The defense of experience . . . is capable of being rebutted; for example, the plaintiff could show that he or she had equal or more experience of the same type.").

In sum, even assuming that genuine issues of material fact exist regarding Plaintiff's prima facie case of EPA wage discrimination, Defendants have met their burden of demonstrating that "'the factor of sex provided *no basis* for the wage differential.'" *Steger*, 318 F.3d at 1078 (quoting *Irby*, 44 F.3d at 954).  Plaintiff has failed to create a genuine issue of material fact with respect to Defendants' affirmative defense by pointing the Court to probative evidence of pretext.  Accordingly, Defendants are entitled to summary judgment on Plaintiff's EPA claims.

## II.  Title VII and § 1981 Claims

In addition to her claims under the EPA, Plaintiff brings numerous claims under Title VII and § 1981 for intentional race and/or gender discrimination in her employment.  Title VII prohibits employment discrimination on the basis of "race, color, religion, sex, or national origin," 42 U.S.C. § 2000e-2(a)(1), and § 1981 "prohibits intentional race discrimination in the making and enforcement of public and private contracts, including employment contracts."  *Ferrill v. Parker Group, Inc.*, 168 F.3d 468, 472 (11th Cir. 1999).   Plaintiff appears to bring claims for disparate treatment, (Compl. ¶ 69 (Defendants "intentionally treated her disparately in her terms and conditions of employment from similarly situated . . . employees")), and hostile work environment, (*id.* ¶ 73 ("Defendant Total System[s] and its agents have engaged in discriminatory, embarrassing and humiliating tactics to frustrate, annoy and insult Plaintiff, and intentionally caused Plaintiff's work environment to become utterly hostile.")).   For the following reasons, the Court finds Defendants are entitled to summary judgment as to each type of claim.

### A.   Disparate Treatment Claims

Plaintiff alleges that Defendants treated her differently on the basis of her race and/or gender in the following ways: (1) Defendants paid Plaintiff different wages than similarly situated white and/or male comparators; (2) Defendants engaged in discriminatory

28

discipline, including ultimately terminating Plaintiff; (3) Defendants denied Plaintiff a promotion to Senior or Lead DBA; (4) Defendants refused to alter Plaintiff's work schedule in accordance with her doctor's instructions; (5) Defendant Day sought additional information to substantiate Plaintiff's doctor's work restrictions; (6) Defendant Day refused to meet with Plaintiff because of her race; (7) Defendant Moon gave Plaintiff a poor evaluation; and (8) Plaintiff was denied a lateral transfer. The Court will discuss each claim in turn.

> 1.   *Disparate Treatment Framework*

"A plaintiff may establish a claim of illegal disparate treatment through either direct evidence or circumstantial evidence." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1085 (11th Cir. 2004). Where, as here, no direct evidence of discrimination exists, the Court uses the now-familiar framework established by the U.S. Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981). Under this framework, a plaintiff first bears the burden of establishing a prima facie case of discrimination. *Wilson*, 376 F.3d at 1087. Once the plaintiff has established her prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the allegedly discriminatory action. *Id.* This burden has been characterized by the Eleventh Circuit as "exceedingly light." *Perryman v. Johnson Prods. Co.*, 698 F.2d 1138,

1142 (11th Cir. 1983).   Once the employer has articulated a legitimate, non-discriminatory reason for the action, "the presumption of discrimination is rebutted, and the burden of production shifts to the plaintiff to offer evidence that the alleged reason of the employer is a pretext for illegal discrimination." *Wilson*, 376 F.3d at 1087.   Evidence of pretext may include the evidence initially offered by the plaintiff to establish her prima facie case; however, when "the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it." *Id.* at 1088.   Throughout this analysis, the plaintiff retains the ultimate burden of persuading the trier of fact that intentional discrimination motivated the employer. *Id.* (citing *Burdine*, 450 U.S. at 253).[18]

   2. *Wage Discrimination Claims*

   Plaintiff's first Title VII and § 1981 claim is for wage discrimination.   Plaintiff contends that Defendants discriminated against her on the basis of her race and gender in setting her pay. Title VII and § 1981 prohibit such practices. *See, e.g., Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1526 (11th Cir. 1992) (holding that "[g]ender-based discrimination in rates of pay to employees, whether male or female, is prohibited by . . . Title VII"); *see also Sumerlin v. AmSouth Bank*, 242 F. App'x 687, 690 (11th

_____

[18]The *McDonnell Douglas* framework applies equally to discrimination claims under Title VII and § 1981. *See, e.g., Springer v. Convergys Customer Mgmt. Group, Inc.*, 509 F.3d 1344, 1347 n.1 (11th Cir. 2007).

Cir. 2007) (per curiam) (claim for race-based wage discrimination under Title VII and § 1981).

To establish a prima facie case of wage discrimination, a plaintiff must prove that (1) she is a member of a protected class; (2) she received low wages; (3) similarly situated comparators outside her protected class received higher wages; and (4) she was qualified to receive the higher wage. *See, e.g., id.* The Court will again assume, without deciding, that Plaintiff has set forth a prima facie case of wage discrimination under Title VII and § 1981. *See Mulhall*, 19 F.3d at 598 (noting that the standard for similarity of job duties is relaxed in a Title VII case, and a plaintiff who can establish a prima facie case under the EPA simultaneously establishes a prima facie case for Title VII purposes). The burden then shifts to Defendants to articulate a legitimate, non-discriminatory reason for the wage differential. *See, e.g., Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1275 (11th Cir. 2008).

As discussed at length in section I.C., Defendants have met this burden by showing that Plaintiff was less experienced and/or had inferior job knowledge and performance in comparison to those male employees who were compensated at higher rates. Because Defendants have carried their burden of demonstrating that no genuine issues of material fact exist with respect to their affirmative defense under the EPA, Plaintiff's gender-based wage discrimination claim also fails. *Miranda*, 975 F.2d at 1528 (noting that Title VII

31

"incorporate[s] the affirmative defenses from the Equal Pay Act . . . allow[ing] employers to defend against charges of discrimination where their pay differentials are based on a bona fide use of 'other factors other than sex'"); *see also* 42 U.S.C. § 2000e-2(h) ("It shall not be an unlawful employment practice under this subchapter for any employer to differentiate upon the basis of sex in determining the amount of wages or compensation paid . . . to employees of such employer if such differentiation is authorized" by the EPA's affirmative defenses).

With respect to Plaintiff's race discrimination claims, the Court also finds that Defendants' legitimate, non-discriminatory reason for the wage differential applies equally to Plaintiff's additional comparators, white female DBAs Melissa Smith and Heather Pruitt. (*See* Pl.'s Resp. to Defs.' Mot. for Summ. J. 12.) Smith was more experienced and educated than Plaintiff when she was hired in 1992 as a Quality Analyst. At that time, Smith possessed three and a half years of programming experience with the Columbus Consolidated Government and had served for another year as a computer assistant. In addition, she had earned a BBA degree from Columbus College. (Ex. 33 to Day Dep.) Smith was promoted to DBA II in 2001, and she served in that capacity until she left TSYS in 2004. (Ex. 34 to Day Dep.) Although Smith's salary at termination exceeded Plaintiff's salary at the comparable time, Smith had more experience than Plaintiff and a college degree.

32

The record also reveals that Pruitt's salary as a Senior DBA exceeded Plaintiff's salary during at least a portion of the relevant time period.[19]  Pruitt was hired in 2000 as a Program Analyst after completing a partnership program between TSYS and Columbus State University which provided intensive, six-month training on mainframe programming.  Pruitt was promoted to DBA I in February 2001, DBA II in January 2003, and Senior DBA in April 2005.  Pruitt's supervisors indicated that Pruitt's rapid promotion was based on job skills that Plaintiff did not possess.  For example, Pruitt had formally mentored junior DBAs, had led projects requiring her to interact with other teams and "with input from all members of the DBA team," had always completed her outages on time and without errors, and was "very knowledgeable" regarding disaster recovery.  (Ex. 8 to Pruitt Dep.)  In contrast, Plaintiff "had not effectively assisted in the development of junior team members," "had not led a major project from planning to implementation, with a timeline, effectively using multiple DBAs for assistance," "lacked in-depth knowledge of disaster recovery," and did not possess "an ability to organize tasks to complete an outage within the scheduled window." (Moon Aff. I ¶¶ 18-19.)  Defendants have plainly met their burden of articulating a

---

[19]Plaintiff's DBA II salary at termination in April of 2006 was $47,463.00.  Pruitt's Senior DBA salary in June of 2006 was $59,725.25. (Pl.'s Ex. 2 to Pruitt Dep., Sept. 17, 2008.)  In 2004, however, when both Plaintiff and Pruitt were DBA IIs, Plaintiff's salary was $47,463.00 and Pruitt's salary was only $44,900.00.  (*Id.*)

legitimate, non-discriminatory reason for the wage differential between Plaintiff and her comparators.

The burden thus shifts back to Plaintiff to demonstrate that Defendants' legitimate, non-discriminatory reason for the wage differential was merely pretext for intentional race or gender discrimination. *See, e.g., Rioux*, 520 F.3d at 1275. Plaintiff has failed to direct the Court to "significantly probative evidence" that "a discriminatory reason more likely than not motivated the employer's decision" or that "discredit[s] the employer's proffered explanation." *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1228 (11th Cir. 1993); *Thomas v. Nicholson*, 263 F. App'x 814, 817 (11th Cir. 2008) (per curiam). As discussed more thoroughly in section II.D., *supra*, Plaintiff has not disputed that each of her comparators, with the exception of Phillips and Pruitt, has more experience and/or education than she does, and Defendants have shown that Phillips and Pruitt had more job knowledge and skills than Plaintiff. *Coats*, 990 F.2d at 1228.

Moreover, as noted in section II.C., Plaintiff's salary as a DBA II was within the salary zone specified for the position, and the evidence in the record simply does not reveal any discernable basis from which it can be reasonably inferred that Plaintiff was discriminated against with respect to her pay. In a Title VII case, Plaintiff retains the ultimate burden of demonstrating that discriminatory animus more likely than not motivated Defendants'

34

actions.  Because Plaintiff has failed to meet this burden, the Court grants Defendants' motion to the extent Plaintiff alleges a wage discrimination claim under Title VII or § 1981.

### 3.   Discriminatory Discipline

Plaintiff also claims that Defendants treated similarly-situated white and/or male employees differently with respect to discipline. Specifically, Plaintiff contends that the two reprimands she received and her termination were discriminatory.  Defendants contend that Plaintiff has not identified any similarly-situated employee who was treated more favorably than Plaintiff; further, Defendants argue that the reprimands do not constitute adverse employment actions.[20]

Although there are a number of ways to formulate a prima facie case for discriminatory discipline, *see, e.g., Rioux*, 520 F.3d at 1275-76, to create an inference of intentional discrimination a plaintiff must generally show that she was treated differently than a similarly situated employee.  In cases of discriminatory discipline, "to determine whether employees are similarly situated, we evaluate 'whether the employees are involved in or accused of the

---

[20]Defendants also allege that several of Plaintiff's Title VII claims are time-barred.  This is likely true with respect to claims accruing more than 180 days before Plaintiff filed her EEOC charge.  *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 (2002) (holding that "[a] discrete retaliatory or discriminatory act 'occur[s]' on the day that it 'happen[s,]'" and thus a plaintiff must "file a charge within . . . 180 . . . days of the date of the act or lose the ability to recover for it"); *see also Watson v. Blue Circle, Inc.*, 324 F.3d 1252, 1258 (11th Cir. 2003).  Given the Court's ultimate disposition of this case, however, the Court finds it unnecessary to attempt to delineate which of Plaintiff's Title VII claims are time-barred, with one exception.  *See* note 28, *infra*.

same or similar conduct and are disciplined in different ways.'" *Burke-Fowler v. Orange County, Fla*., 447 F.3d 1319, 1323 (11th Cir. 2006) (per curiam) (quoting *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999)). "'[T]he quantity and quality of the comparator's misconduct [must] be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges.'" *Id*. (quoting *Maniccia*, 171 F.3d at 1368)).[21]

Plaintiff was issued a first written warning for insubordination in April of 2005 after the incident involving Denise Loving. Moon wrote that Plaintiff's "comments made during the team meeting were in conflict with the statement about the region owners assisting with" the project and were "not in line with team work." (Defs.' Ex. 7 to Pl.'s Dep. II.) Further, Moon warned Plaintiff that her "failure to comply with [Moon's] instruction is insubordination and is not acceptable behavior." (*Id*.) The second reprimand, which constituted Plaintiff's final written warning, was issued in September of 2005, after Plaintiff allegedly refused, in an unprofessional manner, to provide Gandy with documentation to refute her evaluation. The reprimand was based on Plaintiff's "refusal to produce these

---

[21]The *Burke-Fowler* court noted that the Eleventh Circuit's "'nearly identical' misconduct requirement was called into question by a later panel decision" which stated that "'the law only requires 'similar' misconduct from the similarly situated comparator." *Burke-Fowler*, 447 F.3d at 1323 n.2 (quoting *Alexander v. Fulton County, Ga*., 207 F.3d 1303, 1334 (11th Cir. 2000)).  The *Burke-Fowler* court reaffirmed that the "nearly identical" standard, as the standard promulgated in the "earliest case," would continue to control in the Eleventh Circuit. *Id*.

documents and [her] escalated/inappropriate tone during the meeting"
and was for "uncooperative work behavior." (Defs.' Ex. 6 to Pl.'s
Dep. II.) Plaintiff was ultimately terminated on April 21, 2006 for
both continued insubordination and continued uncooperative work
behavior. (Defs.' Ex. 5 to Pl.'s Dep. II.) As an example of
insubordination, Defendants informed Plaintiff she had "circumvented
her management and went to applications on [her] own" when she
rescheduled a system outage; as an example of uncooperative work
behavior, Defendants pointed to co-worker Clifford Johnson's e-mail
"attempt to obtain information from [her]." (*Id.*)

Plaintiff attempts to meet her burden of establishing a prima
facie case by pointing out various TSYS employees she alleges were
equally insubordinate or uncooperative but who were treated more
favorably than she was. Plaintiff argues that white male Tim Simon
"engaged in a physical fight with Moon" and received a negative
evaluation suggesting he needed to assist other employees more
frequently, but "he was neither reprimanded, nor was the altercation
even mentioned in his evaluation by Moon." (Pl.'s Resp. to Defs.'
Mot. for Summ. J. 29.) Likewise, Plaintiff contends that white
female Heather Pruitt "repeatedly exhibited insubordinate behavior
towards Moon" and "was rated low" for failing to assist her co-
workers but was not reprimanded or terminated.[22] (*Id.*) Instead,

---

[22]Plaintiff contends that "Moon confided in Plaintiff that she was
prohibited from reprimanding Simon or Pruitt by Gandy, the departmental
director." (Pl.'s Resp. to Defs.' Mot. for Summ. J. 29.) Even if the
Court accepts this as true, Plaintiff has not alleged that this

Plaintiff contends that these employees "were awarded promotions and pay raises and moved out of Moon's team." (*Id.*)

Neither Simon nor Pruitt are appropriate comparators in this case. In the altercation between Simon and Moon, Simon was actually Moon's superior; he therefore could not have been disciplined for being "insubordinate." (*See* Moon Aff. II ¶ 23.) More importantly, both Simon and Moon were formally verbally reprimanded for the incident.[23] (*Id.*; Ex. 3 to Simon Dep.)

With respect to Pruitt, Plaintiff points to two incidents that she contends exhibited Pruitt's insubordination. Plaintiff first contends that Pruitt disagreed with Moon as to whether an issue should be brought up during a team meeting or deferred to a meeting between Pruitt and Moon alone. Plaintiff also contends that Pruitt ignored Moon's instructions with regard to a work assignment. (Pl.'s SOMF ¶ 171.) With respect to the first incident, Pruitt ultimately followed Moon's instructions to defer raising her objection during the team meeting, and Moon still verbally counseled Pruitt regarding the incident. (Pruitt Dep. 95:1-95:6.) With respect to the second incident, Moon did not consider Pruitt's actions to be insubordinate. (*See* Moon Dep. 175:22-176:12 (noting that Pruitt had never disobeyed

---

prohibition was somehow motivated by a discriminatory animus nor directed the Court to record evidence suggesting such a motive.

[23]The reprimands were issued by HR employee Pat Myhand, who is not a party to this case.

Moon's instructions and had never been insubordinate); *see also* Moon Aff. I ¶ 29.)

The record also demonstrates that Pruitt did not have a history of uncooperative work conduct comparable to Plaintiff's. In addition to the two reprimands and Plaintiff's final termination counseling, Cable documented an "unwritten verbal" counseling on October 19, 2004 after Plaintiff sent Murphy the e-mail indicating that she would "not listen[] to [him] any more." (Defs.' Ex. 8 to Pl.'s Dep. II.) Cable stated that he informed Plaintiff that "it is ok to disagree, but it needs to be done with professionalism." (*Id.*) Likewise, Moon averred that in April of 2005, Plaintiff "screamed" at her after Moon requested that Plaintiff perform some testing; Moon further averred that she did not discipline Plaintiff for this incident because Plaintiff "had recently transferred to my team and I wanted to give her the benefit of the doubt." (Moon Aff. I ¶ 14.) Gandy also witnessed this incident and described it as "a big blowup." (Gandy Dep. 11:15-16, Oct. 9, 2008.) Even as early as 1994, Plaintiff was informed that she "need[ed] to work on verbal communication skills, particularly when handling conflict/problems." (Ex. 3 to Pl.'s SOMF; *see also* Ex. 4 to Pl.'s SOMF at 5 ("One aspect of [Plaintiff's] performance which we have been addressing is how coworkers perceived her communication style. The perception of [Plaintiff] . . . was not positive," and coworkers "indicated [Plaintiff] was very

39

authoritarian about her job, without the technical or managerial expertise to back it up.").)[24]

Plaintiff's opinion that Pruitt was equally insubordinate and uncooperative is not substantiated by the record and is insufficient to create a genuine issue of material fact under the circumstances presented by this case.[25] There are clearly different degrees of insubordination and uncooperative work conduct, and "[d]ifferent types and degrees of misconduct may warrant different types and degrees of discipline[.]" *Burke-Fowler*, 447 F.3d at 1325. Plaintiff has failed to meet her burden of producing evidence of a comparator who was insubordinate and uncooperative on multiple occasions and to the same degree as Plaintiff and was afforded more favorable treatment. Plaintiff has also failed to direct the Court to any other circumstantial evidence suggesting that race or gender-based

---

[24]Pruitt did receive counseling from Moon indicating that she needed to work on her teamwork and cooperation skills. (*See* Pl.'s Ex. 5 to Pruitt Dep. at 2.) Subsequent evaluations, albeit from different supervisors and co-workers, reveal that Pruitt's teamwork skills improved. (Pl.'s Ex. 8 to Pruitt Dep. at 1 (Murphy's assessment that Pruitt "is always willing to answer any questions from team members or customers alike"); *id.* at 2 (Potter's assessment that he "consider[s] Heather to be a very strong team player").) In contrast, the record indicates that Plaintiff's uncooperative work conduct was a continuing problem.

[25]Plaintiff also mentions that both Johnson and Perlmutter, who were the actual region owners, failed to assist Loving and yet were not reprimanded by Moon. It is unclear whether Plaintiff attempts to use these men as comparators. With respect to that particular occasion, Plaintiff was disciplined for the manner in which she refused to assist Loving. Plaintiff has not pointed the Court to evidence in the record that either Johnson or Perlmutter received a direct request for assistance from a co-worker and refused this request in a team setting and in an insubordinate manner. *See Burke-Fowler*, 447 F.3d at 1325 ("Different types and degrees of misconduct may warrant different types and degrees of discipline[.]").

discrimination played a role in Plaintiff's discipline.  *Rioux*, 520 F.3d at 1277 (noting that in the Eleventh Circuit, "'*[i]f a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present*'" (alteration in original) (quoting *Holifield*, 115 F.3d at 1562)); *see also Burke-Fowler*, 447 F.3d at 1325.  Because Plaintiff failed to meet her burden of establishing a prima facie case of discrimination, Defendants are entitled to summary judgment as to these claims.[26]

   *4.   Failure to Promote*

   Plaintiff next contends that she repeatedly sought a promotion to better match her job duties and to equalize her salary with the wages earned by various white and/or male Senior and Lead DBAs. Plaintiff states that she "has consistently maintained that given the actual [Senior and] Lead DBA work she was performing at TSYS, she should have been promoted to [Senior] and/or Lead DBA and also that her salary should have been increased commensurate with her new position." (Pl.'s Resp. to Defs.' Mot. for Summ. J. 13.) Defendants argue that Plaintiff did not perform job duties substantially similar to those of the comparators she identified and that she was

_____

   [26]Plaintiff also appears to make a claim that she was disciplined, denied the opportunity to laterally transfer, and ultimately terminated for making complaints about her pay.  To the extent these complaints are retaliation claims, they are discussed in section III, *infra*.

unqualified for a promotion due to her inferior job knowledge and history of insubordination.

To meet her burden of establishing a prima facie case of discriminatory failure to promote, a plaintiff must prove "(1) that [s]he is a member of a protected class; (2) that [s]he was qualified for and applied for the promotion; (3) that [s]he was rejected; and (4) that other equally or less qualified employees who were not members of the protected class were promoted." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1539 n.11 (11th Cir. 1997). The Court will again assume, without deciding, that Plaintiff has met this burden. Even with this assumption, however, Plaintiff has not produced sufficient evidence to rebut Defendants' contention that they declined to promote Plaintiff because she lacked necessary job knowledge and skills.[27]

---

[27]The Eleventh Circuit has noted that "where a defendant did not consider the qualifications of the candidate from the protected class at the time of making the employment decision, it cannot later assert as a nondiscrimminatory reason the superior qualifications of the candidate actually promoted." *Springer*, 509 F.3d at 1348 (citing *Joshi v. Fla. State Univ. Health Ctr.*, 763 F.2d 1227 (11th Cir. 1985)). The *Springer* court distinguished *Joshi*, however, finding that "[i]n *Joshi*, the defendant had no prior knowledge of Joshi's qualifications because Joshi was not an employee of the defendant. Joshi was an outside applicant." *Id.* Although there was evidence that the plaintiff in *Springer* was not considered for the promotion at issue, the plaintiff had worked for the defendant corporation for a number of years, and the decisionmaker at issue had direct knowledge of the plaintiff's qualifications, performance, and deficiencies which led her to believe that the plaintiff should not be considered for the position. *Id.* The Court finds this case more analogous to *Springer* than to *Joshi*. It is clear that Plaintiff's supervisors during the relevant periods did not consider Plaintiff for a promotion because they believed that Plaintiff's knowledge and performance rendered her unsuitable for promotion. (*See, e.g.,* Moon Aff. I ¶ 18 ("During the time she reported to me, [Plaintiff] was not qualified to be promoted one level to Senior DBA, or two levels to Lead DBA."); Moon Aff.

Plaintiff's sole pretext argument appears to be that because she was already performing the duties of her Senior and Lead DBA counterparts, she was clearly qualified for a promotion to one of those positions. However, Eleventh Circuit "precedent makes clear that where an employee seeks to prove pretext through qualifications alone, the difference in qualifications must be so glaring that no reasonable impartial person could have chosen the candidate selected for the promotion in question over the plaintiff." *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 772 (11th Cir. 2005); *see also Springer*, 509 F.3d at 1349 (noting that "the fact that an employer based a hiring or promotion decision on purely subjective criteria will rarely, if ever prove pretext" unless the record contains "evidence that subjective hiring criteria were used as a mask for discrimination"). Even assuming Plaintiff's contentions that she consistently performed Lead and Senior DBA duties is true, it is clear from the Court's discussion in section II.C. that Plaintiff's qualifications were not vastly superior to those of her proposed comparators. Plaintiff has failed to direct the Court to any other record evidence suggesting another basis for arguing pretext. *Cf. id.* (noting that "where the qualifications disparity is not the *sole* basis for arguing pretext, the disparity need not be so

---

II ¶ 28 (noting that Plaintiff's performance did not meet Moon's expectations in 2005); Murphy Aff. ¶ 7 ("During the time that [Plaintiff] reported to me, I did not believe that her performance warranted a promotion to Senior DBA."); Cable Aff. I ¶ 6 ("After her promotion to DBA II, [Plaintiff's] performance in my opinion did not merit further promotions.").)

dramatic to support an inference of pretext"). In fact, it is evident from the record that TSYS has rapidly promoted both black and female personnel, including Moon, Pruitt, and Lamonia Whitaker. (*See* Moon Aff. II ¶ 2; Ex. 2 to Pruitt Dep.; Day Aff. II ¶ 3.) Plaintiff's failure to promote claim is without merit, and Defendants are entitled to summary judgment.

> 5.   *Remaining Allegations of Disparate Treatment*

Finally, Plaintiff alleges that "the refusal by Cable, Day, Gandy and Moon to honor Plaintiff's doctors' request for reduced hours without weekend and on-call duties was discriminatory and endangered Plaintiff's very physical well-being and life." (Pl.'s Resp. to Defs.' Mot. for Summ. J. 30-31.) She also asserts that Day refused to meet with her regarding her pay claims on three occasions and requested documentation from Plaintiff's doctor to substantiate Plaintiff's medical restrictions. Plaintiff also contends that her poor evaluation dated July 15, 2005 was a discrete act of discrimination and that she was denied a lateral transfer. Defendants contend that these actions do not constitute adverse employment actions for purposes of Title VII and § 1981.

An employee must "establish an 'ultimate employment decision' or make some other showing of substantiality in the employment context in order to establish an adverse employment action." *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008). "Ultimate employment decisions" include decisions related to termination, failure to hire,

or demotion. *Id.* "[C]onduct falling short of an ultimate employment decision must, in some substantial way, 'alter[] the employee's compensation, terms, conditions, or privileges of employment, deprive him or her of employment opportunities, or adversely affect [] his or her status as an employee." *Id.* (alterations in original). For purposes of a Title VII discrimination claim, an employee must demonstrate that "she suffered a *serious and material* change in the terms, conditions, or privileges of employment to show an adverse employment action." *Id.* at 970-71.

With respect to her complaints about her schedule and medical restrictions, Plaintiff claims that comparators Roney Bell and Myron Perlmutter were more favorably treated because Day allowed them to adjust their schedule to accommodate their restrictions and because Day did not contact their physicians to substantiate their restrictions.[28]   It is true that Perlmutter and Bell were both taken off the night on-call rotation in response to their doctor's orders. (Defs.' SOMF ¶¶ 180, 185.)  Plaintiff contends that she was never removed from the on-call rotation, (Pl.'s Resp. to Defs.' SOMF ¶ 193), although Cable avers that she was. (Cable Aff. I ¶ 16). Plaintiff, however, points the Court to no evidence that she was

---

[28]To the extent Plaintiff alleges that the 2005 failure to adjust her schedule was an act of discrimination, the claim is time-barred. Plaintiff confirmed at the June 11th hearing that her only claim with respect to her scheduling requests was for gender discrimination under Title VII. *See Morgan*, 536 U.S. at 110 (requiring plaintiff to "to file a charge within . . . 180 . . . days of the date of the act or lose the ability to recover for it").

actually required to work any on-call hours or that she was required to work more than forty hours a week after Defendants received her 2006 doctor's note.  (Defs.' SOMF ¶ 193; *see* Pl.'s Resp. to Defs.' SOMF ¶ 193.)  Plaintiff was asked to cover one weekend network outage in a week where her total hours worked would not exceed forty,(Day Aff. I ¶ 10), and this scheduled outage was the outage that Plaintiff was terminated for rescheduling.  Thus, it does not appear that Plaintiff can demonstrate that she was required to work on any weekend after Plaintiff's doctor restricted her work hours.[29] Additionally, it is clear to the Court that Day's alleged failure to meet with Plaintiff and her communication with Plaintiff's doctor regarding Plaintiff's medical limitations had no effect on the terms, conditions, or privileges of Plaintiff's employment.  Accordingly, the Court finds that Plaintiff has failed to meet her burden of demonstrating that these incidents of alleged discrimination amount to adverse employment actions.

With respect to Plaintiff's evaluation, the Eleventh Circuit recognizes that a "poor performance evaluation that directly results in the denial of a pay raise of any significance . . . constitutes an adverse employment action under Title VII." *Crawford*, 529 F.3d at 971.  Plaintiff contends that the "July 15, 2005 poor evaluation of Plaintiff by Moon was specifically designed to prevent Plaintiff from

---

[29]Plaintiff does not dispute that Perlmutter and Bell were each required to complete network outages–an essential job function–whenever they occurred, even if on a weekend.  (Day Aff. I ¶ 12; Moon Aff. I ¶ 32; Murphy Aff. ¶ 23.)

securing the 2 positions of Test Analyst and Client Relations . . .
or any other better paying job in the company." (Pl.'s Resp. to
Defs.' Mot. for Summ. J. 30.) Plaintiff, however, has directed the
Court to no evidence that her July 15, 2005 evaluation resulted in
any tangible harm to the terms, conditions, or privileges of her
employment.[30] *See, e.g., Brown v. Snow*, 440 F.3d 1259, 1265 (11th
Cir. 2006) (holding that "a lower score on [a] performance
evaluation, by itself, is not actionable under Title VII unless
[Plaintiff] can establish that the lower score led to a more tangible
form of adverse action, such as ineligibility for promotional
opportunities"). Plaintiff has therefore likewise failed to meet her
burden of establishing that the poor evaluation was an adverse
employment action for Title VII or § 1981 purposes.

---

[30]It is apparent from the record that a written *reprimand* can
foreclose a TSYS employee from transferring to an open position, or
"posting out" of her department, for a six month period. Even to the
extent Plaintiff might establish that Defendants' failure to allow her to
post out of her department is an adverse employment action, Plaintiff has
failed to identify a similarly-situated comparator. Plaintiff alleges
that white male DBAs McAlister and Rajnak were allowed to transfer even
though they had received written warnings and that white female Pruitt was
allowed to transfer even though she had been insubordinate. However,
Defendants have produced evidence that the six-month rule did not apply
to McAlister, Rajnak, and Pruitt. First, these comparators did not post
out of their department; they simply transferred teams and were therefore
not subject to the six-month rule. (Day Aff. I ¶ 13.) Even more
importantly, McAlister, Rajnak, and Pruitt did not receive warnings within
six months of their intradepartmental transfer. (*Id.*) To the extent
Plaintiff contends she was denied an intradepartmental transfer back to
Murphy's team, such denial does not amount to an adverse employment
action. *See, e.g., Njie v. Regions Bank*, 198 F. App'x 878, 883 (11th Cir.
2006) (per curiam) (holding that an "apples and apples" lateral transfer,
that is, "a lateral transfer with full retention of benefits could not be
described as an adverse employment action").

47

B.   Plaintiff's Hostile Work Environment Claims

Plaintiff also alleges that TSYS "and its agents have engaged in discriminatory, embarrassing and humiliating tactics to frustrate, annoy and insult Plaintiff, and intentionally caused Plaintiff's work environment to become utterly hostile." (Compl. ¶ 67.)  In order to recover under a hostile work environment theory, a Plaintiff must show that

> (1) [s]he belongs to a protected group; (2) that [s]he has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee . . .; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability.

*McCann v. Tillman*, 526 F.3d 1370, 1378 (11th Cir. 2008) (alterations in original).  Defendants contend that Plaintiff has failed to meet her burden of demonstrating that (1) any alleged harassment was based on Plaintiff's race or gender; (2) any alleged harassment was sufficiently severe and pervasive to alter the terms of Plaintiff's employment; and (3) a basis for holding TSYS liable exists. (Defs.' Mem. of Law in Supp. of Defs.' Mot. for Summ. J. 33-35.)

In her response to Defendants' motion for summary judgment, Plaintiff appears to conflate her hostile work environment and disparate treatment claims. (*See* Pl.'s Resp. to Defs.' Mot. for Summ. J. 25.)  Title VII disparate treatment and hostile work environment claims are qualitatively different, however. A Title VII disparate treatment claim focuses on "'[d]iscrete acts such as

48

termination, failure to promote, denial of transfer, or refusal to hire.'" *McCann*, 526 F.3d at 1378 (quoting *Morgan*, 536 U.S. at 114-16). In contrast, "a hostile work environment claim addresses acts 'different in kind' whose 'very nature involves repeated conduct,' such as 'discriminatory intimidation, ridicule, and insult.'" *Id.* (quoting *Morgan*, 536 U.S. at 114-16). A hostile work environment claim is thus necessarily based upon the cumulative effect of acts whose nature involves repeated conduct, which "collectively constitute one 'unlawful employment practice.'" *Id.* (quoting *Morgan*, 536 U.S. at 117).

As previously discussed, the majority of incidents about which Plaintiff complains "constitute discrete acts that must be challenged as separate statutory discrimination and retaliation claims." *McCann*, 526 F.3d at 1379. These claims "cannot be brought under a hostile work environment claim that centers on discriminatory intimidation, ridicule, and insult." *Id.* (internal quotation marks omitted).

With respect to any claims that have not already been disposed of as discrete acts, Plaintiff fails to direct the Court to sufficient evidence in the record demonstrating a hostile work environment. Plaintiff has identified only a handful of instances over the course of her thirteen-year employment that are not discrete acts that must be separately challenged. *See McCann*, 526 F.3d at 1379; *see also* section II.A.5., *supra*. Plaintiff points the Court

49

to no evidence in the record suggesting that these incidents were based on her race or gender.  Plaintiff admits that no Defendant ever made racially or sexually disparaging remarks to her, (Pl.'s Dep. I 134:11-138:7), and she has failed to propound any other factual basis to support her contention that these incidents were race or gender-based.  Accordingly, the Court finds Defendants are entitled to summary judgment on Plaintiff's § 1981 and Title VII claims based on a racially hostile work environment and Plaintiff's Title VII claim based on a sexually hostile work environment.

**III. Plaintiff's Retaliation Claims**

Plaintiff also alleges retaliation by TSYS, Gandy, Day, Moon, and Cable under Title VII, § 1981, and the EPA.  In opposition to Defendants' motion for summary judgment, Plaintiff asserts that she "repeatedly complained to her managers and supervisory chain of command about the discriminatory pay, promotion and transfers, and other harassing conduct she experienced on the job," and they failed to take any action to address Plaintiff's concerns.  (Compl. ¶ 79.) Instead, Plaintiff contends, she "was repeatedly written up and reprimanded for lodging her complaints to Cable, Gandy, Rayl, and Holleck in order to prevent any future vertical or horizontal job mobility" and "her physician-recommended work restrictions were disregarded."  (*Id.*)

Since the facts giving rise to Plaintiff's retaliation claims are identical and the legal analysis is the same under Title VII, § 1981, and the EPA, the Court addresses these claims collectively.

50

*See, e.g., Alford v. Cosmyl, Inc.*, 209 F. Supp. 2d 1361, 1369 n.5 (M.D. Ga. 2002).   In order to prevail on her retaliation claims, Plaintiff must begin by establishing a prima facie case of retaliation.  *Holifield*, 115 F.3d at 1566.  If Plaintiff establishes her prima facie case, Defendants bear the burden of articulating a legitimate, non-retaliatory reason for the challenged action.  *Id.* Plaintiff can then defeat summary judgment by creating a question of fact as to whether Defendants' reason is mere pretext for retaliation.  *Id.*

Plaintiff appears to allege six separate acts of retaliation: (1) the 2005 failure to adjust her schedule; (2) the April 2005 reprimand; (3) the July 2005 evaluation; (4) the September 2005 reprimand; (5) the 2006 failure to adjust her schedule; and (6) the April 2006 termination.  For the following reasons, the Court concludes that Defendants are entitled to summary judgment as to each of Plaintiff's retaliation claims.

A.   Plaintiff's Prima Facie Case

A plaintiff may present a prima facie case of retaliation by proving three elements: "'first, the plaintiff engaged in statutorily protected conduct; second, the plaintiff suffered an adverse employment action; and finally, the adverse action was causally related to the protected expression.'"  *Williams v. Motorola, Inc.*, 303 F.3d 1284, 1291 (11th Cir. 2002) (quoting *Farley v. Nationwide Mut. Ins. Co.*, 197 F.2d 1322, 1336 (11th Cir. 1999)).   Several of

51

Plaintiff's retaliation claims fail because Plaintiff has failed to establish a prima facie case of retaliation.

>    1.   *Statutorily Protected Activity*

Defendants assert that Plaintiff has failed to meet her burden of establishing that she engaged in statutorily protected activity. In opposition to Defendants' motion for summary judgment, Plaintiff contends that Defendants retaliated against her (1) because of her efforts to leave Moon's team, (Pl.'s SOMF ¶ 179); (2) because of her demands for pay increases and promotions, (*id.*); and (3) because she complained about and insisted on racial and gender equity in her salary and position title, (*id.* ¶ 159).[31]   Plaintiff has made no

----

[31]In her declaration, Plaintiff contends that she "repeatedly requested a promotion and/or pay raise to equalize [her] pay rate or salary scale with" white and/or male DBA IIs, Senior DBAs, and Lead DBAs. (Pl.'s Decl. ¶ 69.)  Plaintiff also contends that she "consistently and repeatedly complained about race and gender/pay inequities and discrimination, disparate treatment, hostile working environment and a host of TSYS' discriminatory acts against [her] to her respective supervisors and/or managers." (*Id.* ¶ 71; *see also id.* ¶ 72.)  Plaintiff never asserts that she specifically complained that the reprimands she received and Defendants' failures to adjust her schedule were unlawfully discriminatory; rather, Plaintiff contends that these actions were in retaliation for her pay and promotion complaints. (*See, e.g.,* Compl. ¶¶ 79-80; Pl.'s SOMF ¶¶ 159, 179.)

In addition, even if Plaintiff's contention that she complained that she was subjected to a hostile work environment were supported by the record, Plaintiff could not have had an objectively reasonable belief that she had been subjected to a hostile work environment.  Plaintiff has pointed the Court to no evidence whatsoever that any of the alleged harassment she experienced was based on her race or gender; thus, any such complaint could not be considered protected activity. *Cf., e.g., Butler v. Ala. Dep't of Transp.*, 536 F.3d 1209, 1214 (11th Cir. 2008) (finding it objectively unreasonable for plaintiff to believe that the use of racially discriminatory language on one occasion could create a hostile work environment); *see also Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1351-52 (11th Cir. 1999).

effort to explain how her complaints regarding leaving Moon's team constitute a protected activity.  However, viewing the record in the light most favorable to Plaintiff, it is apparent that Plaintiff complained about the fact that she was not receiving pay and promotions equivalent to that received her male and white counterparts.  (*See, e.g.,* Pl.'s Dep. I 97:20-98:10 (Plaintiff testifies she complained to Gandy that she "did the same work as [her] Caucasian coworkers but [she] was not being paid at the rate they were").)  Such complaints can constitute statutorily protected activity for purposes of Plaintiff's retaliation claims. *See, e.g., Holifield*, 115 F.3d at 1566 (finding that plaintiff engaged in statutorily protected activity when "he voiced his concerns about racial discrimination to his superiors").

    2.   *Adverse Employment Actions*

Anti-retaliation provisions "protect[] an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006).  To demonstrate that an action taken by an employer is sufficiently harmful to sustain a retaliation claim, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Id.* at 68 (internal quotation marks omitted).

53

Defendants assume that Plaintiff suffered an adverse action for purposes of her retaliation claim.  It appears likely that Defendants make this assumption because they take the position that Plaintiff named only two retaliatory adverse employment actions in her deposition—the September 2005 reprimand and the April 2006 discharge–and therefore, those are the only two retaliatory actions for which Plaintiff may recover.  As previously mentioned, however, Plaintiff's Complaint, declaration, and statement of material facts reveal that she contends Defendants engaged in six retaliatory acts. The Court will therefore assume, without deciding, that Plaintiff's termination, reprimands, and poor evaluation were adverse employment actions for purposes of Plaintiff's retaliation claims.

The Court cannot conclude, however, that Defendants' purported failure to adjust Plaintiff's schedule in 2006 was an adverse employment action.  As discussed in section II.A.5., *supra*, the only evidence of record demonstrates that Defendants did accommodate Plaintiff's medical restrictions after receiving a note from Plaintiff's doctor in 2006.  No reasonable employee could have found such action materially adverse.  Accordingly, Defendants' action with respect to Plaintiff's 2006 medical restrictions cannot be considered an adverse employment action for purposes of Plaintiff's retaliation claims.  Plaintiff has therefore failed to meet her burden of establishing her prima facie case as to this particular claim.

Likewise, the Court cannot conclude that Defendants' failure to adjust Plaintiff's schedule in 2005 was an adverse employment action,

54

given the particular circumstances of this case.  The Supreme Court has held that "the significance of any given act of retaliation will often depend upon the particular circumstances.  Context matters." *White*, 548 U.S. at 69.  The Court must therefore examine "the materiality of the challenged action and the perspective of a reasonable person in the plaintiff's position."  *Id.* at 69-70.

In this particular case, no reasonable person in Plaintiff's position could have considered Moon's alleged failure to adjust Plaintiff's work schedule in 2005 to be materially adverse.  Plaintiff was certainly not *entitled* to any accommodation based on the 2005 doctor's note alone; "[e]mployers have no duty to accommodate an employee if the employee is not disabled under the [Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* ("ADA")]."  *Swain v. Hillsborough County Sch. Bd.*, 146 F.3d 855, 858 (11th Cir. 1998).[32]  Plaintiff has not alleged that she is disabled within the meaning of the ADA; a reasonable person in Plaintiff's situation would therefore understand that she might not get an accommodation even after requesting one.  Furthermore, Plaintiff has not shown that she ever communicated to her employer specific facts

---

[32]The Court does not deny the possibility that under circumstances different from those presented in this case, the failure to provide an accommodation could possibly give rise to a retaliation claim under Title VII, § 1981, or the EPA.  *See, e.g., Villaruel v. Gary Cmty. Sch. Corp.*, 28 F. App'x 564, 569 (7th Cir. 2002) (recognizing Title VII retaliation claim may exist based on retaliatory failure to accommodate disabilities but concluding that employer's failure to grant employee's request to work out of a single location was not an adverse employment action because the plaintiff's doctor did not order such an accommodation).

regarding her need for an accommodation.   Even though Plaintiff contends that she "consistently and repeatedly" complained to her entire chain of command about "discriminatory acts," (Pl.'s Decl. ¶¶ 71, 72), Plaintiff never avers that she complained about Moon's failure to adjust her schedule and never questioned why Moon had not attempted to accommodate her purported medical restrictions.   Despite her allegedly frequent complaints of discrimination, Plaintiff waited a full year before reasserting her claim that she required a schedule change to accommodate her medical needs.

The anti-retaliation provisions at issue in this case protect only against "retaliation that produces an injury or harm." *White*, 548 U.S. at 67.   The Court concludes that under the particular circumstances presented by this case—where Plaintiff has not demonstrated her entitlement to an accommodation, has not communicated to her employer the  specific facts regarding her specific need for an accommodation, and where no change in job duties or hours was made—no reasonable person could conclude that Moon's failure to adjust Plaintiff's schedule to accommodate her unspecified "health problems" was materially adverse.

### 3.   *Causal Connection*

The Court next finds that Plaintiff has failed to establish a causal connection between any complaint of discrimination and her July 2005 evaluation.   To establish a causal connection, a plaintiff must show, at a minimum, that (1) the decisionmakers were aware of the protected conduct and (2) the protected activity and the adverse

action were not wholly unrelated. *See, e.g., McCann*, 526 F.3d at 1376. A plaintiff may demonstrate that the protected activity and the adverse action were related "by showing close temporal proximity between the statutorily protected activity and the adverse employment action." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (per curiam). However, in the absence of other evidence demonstrating a causal link, "mere temporal proximity, without more, must be very close." *Id.* (internal quotation marks omitted). A three to four month period between the date of the complaints and the date of the adverse employment action, without more, has been held insufficient to establish causation. *Id.* (holding that summary judgment was appropriate because plaintiff "failed to present evidence from which a reasonable jury could find any causal connection between her April 2005 complaint(s) of sexual harassment and the termination of her employment three (3) months later").

Plaintiff contends that in January and March of 2005, she requested that Moon, her evaluator, equalize her salary and title with the salaries and titles of her white and male counterparts.[33]

---

[33]Plaintiff also contends that she made this same complaint to Moon "each year during [her] Right Steps review meetings between 2001 and 2006," (Pl.'s Decl. ¶ 69), and that she made similar complaints to other supervisors "during promotion recommendation submission times in Spring and Fall periods between 2001 and 2006," (*id.* ¶ 71; *see also* ¶ 72). Plaintiff fails to provide the specific dates these meetings occurred, and with respect to her complaints to other supervisors, Plaintiff fails to point to evidence suggesting these other supervisors notified Moon of Plaintiff's complaints. Without these specifics, it would be pure conjecture for the Court to reach a conclusion on when and to whom Plaintiff complained. Because it is Plaintiff's burden to establish her prima facie case, these failures must be construed against her.

(Pls.' Decl. ¶ 69.)  Plaintiff received her unfavorable evaluation approximately four months after this alleged complaint, in July of 2005.  Because the requisite causal link cannot be provided by temporal proximity and Plaintiff produces no other evidence linking the evaluation to statutorily protected activity, Plaintiff has failed to establish a prima facie case that her evaluation was retaliatory.

  B.  Legitimate, Non-Retaliatory Reasons and Pretext

  With respect to Plaintiff's claims that Defendants retaliated against her by reprimanding her and ultimately discharging her, the Court assumes that Plaintiff has set forth a prima facie case of retaliation.  Thus, the burden shifts to Defendants to proffer a legitimate, non-retaliatory reason for the adverse employment action. *See, e.g., Raney v. Vinson Guard Serv., Inc.*, 120 F.3d 1192, 1196 (11th Cir. 1997).  Once Defendants proffer such a reason, Plaintiff bears the burden of demonstrating that any such reason was merely a pretext for retaliation.  *Id.* at 1196-97.

  The Eleventh Circuit has repeatedly emphasized that a federal court should not "'act as a super personnel department that second-guesses employers' business judgments.'"  *Wilson*, 376 F.3d at 1092 (quoting *Lee v. GTE Fla., Inc.*, 226 F.3d 1249, 1254 (11th Cir. 2000) (per curiam)).  Thus, in order to show an employment action was a pretext for discrimination or retaliation, a plaintiff must "establish not that it was unusual but that the stated reason . . .

58

was a fabrication, designed to conceal an unlawful reason." *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 684 (7th Cir. 2000). "A 'pretext for discrimination' [or retaliation] means more than an unusual act; it means something worse than a business error; 'pretext' means deceit used to cover one's tracks." *Id.* (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 146-47 (2000)). A reason cannot be a "pretext for discrimination [or retaliation] unless it is shown *both* that the reason was false, *and* that discrimination [or retaliation] was the real reason." *Brooks v. County Comm'n of Jefferson County, Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (internal quotation marks omitted). Plaintiff must therefore point to specific, concrete facts which support her assertion that any reason for Defendants' legitimate, non-retaliatory actions were pretextual. *Raney*, 120 F.3d at 1198 ("Summary judgment cannot be avoided . . . based on hunches unsupported with significant probative evidence."); *see also Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990) ("To survive summary judgment, the plaintiff must . . . present concrete evidence in the form of specific facts which show that the defendant's proffered reason is mere pretext. Mere conclusory allegations and assertions will not suffice."). Given this standard, Plaintiff cannot meet her burden of producing probative evidence of pretext on her remaining retaliation claims.

      1.    *Reprimands*

Plaintiff first alleges that the reprimands she received from Moon and Gandy were retaliatory.  Defendants contend that Moon issued the first reprimand because Plaintiff refused to assist her co-worker, Denise Loving, in a team setting and in an insubordinate manner; Defendants contend that Gandy issued the second reprimand because Plaintiff was unprofessional and rude during her meeting with Gandy and Cable.

An employer may discipline "an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory [or retaliatory] reason."  *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir. 1984).  "A plaintiff must show not merely that the defendant's employment decisions were mistaken, but that they were in fact motivated by race" or gender or unlawful retaliation. *Brooks*, 446 F.3d at 1163 (internal quotation marks omitted).  Thus, a plaintiff's "self-serving assertion that she was not insubordinate does not alone establish that she was" subjected to unlawful discrimination or retaliation, and whether Plaintiff's "conduct was insubordinate is not an issue for this Court to referee." *Wilson*, 376 F.3d at 1092.

Plaintiff has failed to produce sufficient evidence to permit a reasonable finder of fact to conclude that Defendants' legitimate, non-retaliatory reasons for reprimanding Plaintiff were pretextual. Plaintiff does not dispute the fact that she did not help Loving

60

immediately upon Loving's request, (Pl.'s Decl. ¶ 74), and Plaintiff has pointed to no evidence discrediting Moon's (and apparently, Loving's) honest belief that Plaintiff was the proper region owner to provide assistance and that Plaintiff's actions were insubordinate, (Moon Dep. 166:13-23). Likewise, Plaintiff has produced no evidence—other than her own testimony—to rebut Defendants' contention that Plaintiff was unprofessional and rude during her meeting with Gandy and Cable. Standing alone, Plaintiff's subjective belief that she was not insubordinate and uncooperative and therefore did not deserve to be disciplined is insufficient to create a genuine issue of material fact regarding pretext. *See Wilson*, 376 F.3d at 1092; *see also Nix*, 738 F.2d at 1187 ("Title VII does not take away an employer's right to interpret its rules as it chooses, and to make determinations as it sees fit under those rules.").

### 2.   *Termination*

Plaintiff also alleges that her termination was retaliatory. Defendants contend that Plaintiff was terminated for her continued insubordination and uncooperative work conduct, as evidenced by (1) her unauthorized and misleading contact with the internal client to reschedule a system outage already arranged by her supervisors; and (2) her unhelpful response to Clifford Johnson's request for assistance. Plaintiff must therefore demonstrate that each of Defendants' legitimate, non-retaliatory reasons for her termination

was merely a pretext for unlawful retaliation. *See, e.g., Crawford v. City of Fairburn, Ga.*, 482 F.3d 1305, 1308 (11th Cir. 2007) ("If the employer proffers more than one legitimate, nondiscriminatory reason, the plaintiff must rebut each of the reasons to survive a motion for summary judgment.").

As evidence of pretext, Plaintiff contends that it was customary for her to contact internal clients to schedule outages and that her supervisors did not specifically prohibit her from such contact in this case.  Plaintiff also contends that she did, in fact, assist Johnson over the phone after she received his e-mailed question.

The Court first notes that despite Plaintiff's claims to the contrary, documentary evidence in the record demonstrates that Plaintiff did receive notice that the outages were scheduled for a weekend, yet she contacted the client to schedule them for a weekday even after receiving such notice. (*See* Ex. A to Moon Aff. II.)  Even assuming that Plaintiff did customarily contact internal clients to schedule outages, Plaintiff admits that she did not inform the client of the duration of the outage in this particular case. (Pls.' Decl. ¶ 108.)  Plaintiff also fails to directly rebut Defendants' contentions that they believed Plaintiff had misled the client by failing to inform the client of the outage duration and that management was required to intervene and resolve the confusion resulting from this failure. (*See, e.g.,* Moon Aff. I ¶ 22; Defs.' ¶¶ SOMF 101, 103-04; *see also Wilson*, 376 F.3d at 1088 (noting that

when "the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it").)

Further, even assuming Plaintiff did ultimately assist Johnson with his request, she declined to do so at first and instead sent the e-mail which prompted Johnson's complaint to his supervisor. Defendants could have reasonably interpreted this conduct as uncooperative, particularly given Plaintiff's documented history of uncooperative conduct. (*See, e.g.,* Moon Aff. I ¶¶ 20, 21; *see also* section II.A.3., *supra*.) And, of course, this Court is not in the business of refereeing a dispute regarding whether Plaintiff was insubordinate or uncooperative. *See, e.g., Wilson*, 376 F.3d at 1092. Plaintiff has therefore failed to meet her burden of establishing that Defendants' proffered reasons for her termination are merely pretext for unlawful retaliation.

In sum, Plaintiff has either failed to establish a prima facie case of retaliation or has failed to create a genuine issue of material fact as to whether Defendants' legitimate, non-retaliatory reasons for the adverse employment actions were pretextual. Accordingly, Defendants are entitled to summary judgment as to each of Plaintiff's retaliation claims.

## CONCLUSION

For the foregoing reasons, Defendants are entitled to summary judgment as to each of Plaintiff's federal law claims. Because this Order disposes of all federal claims in this case, the Court declines

63

to exercise jurisdiction over Plaintiff's state law claims for negligent retention and intentional infliction of emotional distress and dismisses those claims without prejudice.

IT IS SO ORDERED, this 6th day of August, 2009.

S/Clay D. Land
CLAY D. LAND
UNITED STATES DISTRICT JUDGE